UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANTONIO MALLET,

                    Plaintiff,

    – against –

THE CITY OF NEW YORK, JOSEPH NIEVES,
CHRISTOPHER CUOMO, PUBLIC
ADMINISTRATOR OF WESTCHESTER
COUNTY, *as Representative of the Estate of
Kevin Tracy, Deceased*, DONALD R.
GANNON, *as Representative of the Estate of
Donald A. Gannon, Deceased*, and JOHN/JANE
DOES 3-20.

                    Defendants.

Case No. 25-CV-3755

**AMENDED COMPLAINT**

JURY TRIAL DEMANDED

**SHANIES LAW OFFICE**

David B. Shanies
Deborah I. Francois
Eleanor C. Davis
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
*david@shanieslaw.com*
*deborah@shanieslaw.com*
*eleanor@shanieslaw.com*

**LAW OFFICE OF RONALD L. KUBY**

Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, New York 10011
(212) 529-0223 (Tel)
*ronaldkuby@gmail.com*

*Attorneys for Plaintiff Antonio Mallet*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

NATURE OF THE ACTION ............................................................................................... 2

JURISDICTION AND VENUE .......................................................................................... 4

CONDITIONS PRECEDENT ............................................................................................. 4

PARTIES .............................................................................................................................. 5

JURY DEMAND .................................................................................................................. 7

FACTS .................................................................................................................................. 7

    A.  The Crime and Antonio Mallet's Innocence................................................................ 7

    B.  The Interrogation of Gregory Walker ........................................................................ 9

        1.  3:00 a.m. Statement.......................................................................................... 11

        2.  5:35 a.m. Statement.......................................................................................... 11

        3.  Two 8:30 p.m. Statements ................................................................................ 11

        4.  10:30 p.m. Statement ....................................................................................... 12

    C.  The *Wade* Hearing .................................................................................................. 13

    D.  The Trial.................................................................................................................... 14

    E.  The Verdict and Sentencing..................................................................................... 15

    F.  Direct Appeal and Other Prior Post-Conviction Litigation ..................................... 16

    G.  The 2019 Motion to Vacate ..................................................................................... 18

    H.  The Joint Reinvestigation with the Westchester County District Attorney's Office........ 21

        1.  Interviews of Gregory Walker ......................................................................... 22

        2.  Interviews of Kelvin Rosado ........................................................................... 22

        3.  Interview of Detective Joseph Nieves............................................................. 23

        4.  Discovery of Two Versions of Gregory Walker's 10:30 p.m. Statement................... 24

        5.  Detectives Joseph Nieves and Kevin Tracy's Histories of Misconduct ..................... 24

I.   The Motion to Vacate and the Trial Court's Decision.........................................................27

J.   The City of New York's Deliberate Indifference to Police and Prosecutorial Misconduct, and Its Failure to Train, Supervise, and Discipline Its Employees...................................28

DAMAGES.................................................................................................................................46

CAUSES OF ACTION................................................................................................................47

FIRST CAUSE OF ACTION
42 U.S.C. § 1983: Denial of Due Process and Right to a Fair Trial,
Fabrication of Evidence, and Suppression of *Brady* Information...........................................47

SECOND CAUSE OF ACTION
42 U.S.C. § 1983: Malicious Prosecution and Denial of Fourth Amendment Rights ............50

THIRD CAUSE OF ACTION
42 U.S.C. § 1983: *Monell* Claim
.................................................................................................................................................52

FOURTH CAUSE OF ACTION
New York State Law: Malicious Prosecution.........................................................................55

FIFTH CAUSE OF ACTION
New York State Constitution: Denial of Due Process and Right to a Fair Trial,
Fabrication of Evidence, Suppression of Exculpatory Information, and
Malicious Prosecution
.................................................................................................................................................57

SIXTH CAUSE OF ACTION
New York State Law: Negligence
.................................................................................................................................................57

REQUEST FOR RELIEF .........................................................................................................58

Plaintiff Antonio Mallet, by his undersigned counsel, the Shanies Law Office and the Law Office of Ronald L. Kuby, as and for his complaint against the above-named Defendants, alleges as follows:

## **INTRODUCTION**

1. Mr. Mallet brings this action under 42 U.S.C. § 1983 and New York State law, seeking to recover damages caused by the denial of his constitutional and legal rights and his resulting wrongful conviction and loss of liberty.

2. Mr. Mallet was unjustly arrested, convicted, and imprisoned for the 1996 murder of Michael Ledeatte in Bronx, New York—a crime of which Mr. Mallet was innocent.

3. Mr. Mallet's conviction was vacated in September of 2024 following an exhaustive review by the Westchester County District Attorney's Office's (the "WCDA") Conviction Review Unit (the "CRU") that determined that Mr. Mallet was wrongfully convicted.

4. Mr. Mallet is and always was innocent of the crime.

5. Mr. Mallet's conviction was the result of egregious government misconduct, particularly by former New York City Police Department (the "NYPD") detectives Joseph Nieves and Kevin Tracy.

6. Nieves and Tracy, along with former NYPD detective Donald A. Gannon—who either participated directly or failed to intervene and acquiesced in his fellow detectives' misconduct—fabricated the sole evidence used to convict Mr. Mallet: a false eyewitness identification by Gregory Walker.

7. The WCDA, which the Bronx County Supreme Court appointed as special district attorney in the case, specifically relied on "Walker's description of physical and psychological coercion by former NYPD detectives Nieves and Tracy" in concluding that Mr. Mallet is innocent.

1

8. Moreover, the WCDA observed, both Nieves and Tracy "have been credibly accused of bad acts," such that Nieves, the only living detective (Gannon died in 2004 and Tracy died in 2017) "would not be called in any further prosecution" of the case. The WCDA likewise noted that Tracy "has been credibly accused of being violent, including in the course of his law enforcement duties."

9. As a result of his wrongful conviction and imprisonment, Mr. Mallet was deprived of his liberty for more than 20 years.

10. Absent the Defendants' fabrication of evidence and suppression of exculpatory information, Mr. Mallet never would have been convicted.

11. The following factors, among others, caused Mr. Mallet's wrongful conviction: the misconduct of Joseph Nieves, Kevin Tracey, Donald A. Gannon, and John and Jane Does 3-20 (together, the "Individual Defendants"); the unlawful failure by Defendant the City of New York (the "City") to prevent its agents' unlawful conduct, including by failing to train, supervise, and discipline its employees; and the City's unlawful policies, customs, and practices that caused violations of the constitutional rights of criminal suspects and defendants, including Mr. Mallet.

12. Mr. Mallet seeks redress for the official misconduct that caused him to spend more than 20 years in prison, and the mental and physical injuries he sustained while incarcerated, as a result of his false and unlawfully procured conviction.

## NATURE OF THE ACTION

13. This is an action to recover compensatory and punitive damages and an award of costs and attorneys' fees for violations of Mr. Mallet's rights secured by 42 U.S.C. §§ 1983 and 1988 and the U.S. Constitution, including its Fourth, Fifth, and Fourteenth Amendments, and under New York State law, due to Defendants' fabrication of evidence to arrest and convict Mr. Mallet for crimes he did not commit and suppression of information that was material to the determination

of Mr. Mallet's innocence or guilt. Specifically, then-Detectives Nieves and Tracy coerced a witness into giving a false identification of Mr. Mallet as the perpetrator of a murder, and then-Detective Gannon participated in this coercion and/or knew and failed to intervene or was deliberately indifferent to the fact that Nieves and Tracy coerced a false witness statement identifying Mr. Mallet. This coerced and false witness identification served as the sole basis for Mr. Mallet's arrest, indictment, prosecution, and more than 20 years of wrongful incarceration. Additionally, the Individual Defendants violated Mr. Mallet's constitutional rights to due process and a fair trial by withholding exculpatory and other favorable information that would have prevented the wrongful conviction.

14. The lawsuit also seeks to hold the City liable for constitutional violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City, through the NYPD and Bronx County District Attorney's Office (the "BXDA"), maintained unlawful policies, practices, and customs during Mr. Mallet's investigation, arrest, and trial. In executing those unlawful policies, practices, and customs, the City violated the constitutional rights of criminal suspects and defendants, including Mr. Mallet. In Mr. Mallet's case, the unlawful policies, practices, and customs enabled Individual Defendants, as well as other members, servants, employees, and agents of the City, to violate Mr. Mallet's constitutional rights. The policy-making officials acting on behalf of the City were deliberately indifferent to the constitutional violations that those unlawful policies, practices, and customs caused. The City is also liable under New York state law, under the doctrine of *respondeat superior*, for the tortious conduct of its agents and violations of the New York State Constitution. As a result, all Defendants are jointly and severally liable for Mr. Mallet's injuries.

## JURISDICTION AND VENUE

15.     This action is brought under 42 U.S.C. §§ 1983 and 1988 because Mr. Mallet alleges that he was deprived under color of law of his rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, including by the coercion of a false witness statement identifying him; the fabrication of evidence, including the false statements and testimonies of Gregory Walker, an eyewitness, and Detective Tracy;  Mr. Mallet's arrest and prosecution in the absence of probable cause; the suppression of *Brady* information;[1] and the denial of Mr. Mallet's rights to due process and a fair trial.

16.     This Court has original subject matter jurisdiction over Mr. Mallet's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. Mallet's constitutional and civil rights, and supplemental jurisdiction over Mr. Mallet's state law claims under 28 U.S.C. § 1367.

17.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391(b)(1) because all Defendants are residents of New York and Defendant City of New York resides in both the Eastern and Southern Districts of New York.

## CONDITIONS PRECEDENT

18.     Mr. Mallet has complied with all conditions precedent to the commencement of this action, having timely served on October 23, 2024 a notice of claim upon the Comptroller of the

---

1.  All references in this complaint to *Brady* and/or exculpatory information refer to the government's obligation under the Due Process Clauses of the Fifth and Fourteenth Amendments to disclose favorable information to a criminal defendant, and corresponding protections under the New York State Constitution.  *See, e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *United States v. Agurs*, 427 U.S. 97, 103-07 (1976); *Giglio v. United States*, 405 U.S. 150, 155 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Wilde v. Wyoming*, 80 S. Ct. 900, 901 (1960); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 335 U.S. 28, 31 (1957); *Berger v. United States*, 295 U.S. 78, 88 (1935); *Poventud v. City of New York*, 750 F.3d 121, 133-36 (2d Cir. 2014); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 137 (2d Cir. 1964); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 570-71 (2d Cir. 1961); *United States v. Zborowski*, 271 F.2d 661, 668 (2d Cir. 1959).

City of New York, under Section 50-i of the New York General Municipal Law; having waited more than 30 days since said service, without these claims having been settled or otherwise resolved; having had a hearing on March 4, 2025, under Section 50-h of the New York General Municipal Law; and having brought this action in a timely manner.

**PARTIES**

19.     Plaintiff Antonio Mallet is a citizen of the United States and was, prior to his incarceration, a resident of the City and State of New York.

20.     Defendant the City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City and State of New York, and having the powers and duties imposed by law thereon.

21.     The NYPD and the BXDA are and were at all relevant times agencies of the City. At all times relevant to this action, the City, by its agents, servants, and employees, was responsible for the operation, maintenance, and control of the NYPD and the BXDA, and for the selection, training, supervision, and discipline of police officers and prosecutors.

22.     At all relevant times, the Bronx County District Attorney (the "District Attorney" or "DA"), including Robert T. Johnson, was and is an elected officer of Bronx County responsible for BXDA, an agency funded by the City.

23.     At all relevant times, the BXDA and its authorized delegates had final authority, and constituted policymakers for the City and for whom the City is liable, with respect to the hiring, management, training, supervision, and discipline of personnel employed by or assigned to the BXDA.

24.     The State of New York has provided by statute that the City's constituent counties—including Bronx County—are liable for torts committed by County officers and employees, such as the District Attorney and Bronx County Assistant District Attorneys, and other

5

employees of the BXDA.  *See* N.Y. County Law § 53.  The City provides full indemnification to the BXDA.  *See* N.Y. City Charter § 7-110.

25.    Defendant the City of New York was at all relevant times the public employer of Defendants Nieves, Tracey, and Gannon, and John and Jane Does 3-20, and legally responsible for torts they committed within the scope of their employment or under color of law.  Defendant the City of New York is also obligated under law and by contract to indemnify and defend Individual Defendants named herein.

26.    Defendant Joseph Nieves is a former officer of the NYPD and a resident of the State of New York.  At all relevant times, he was a duly appointed and acting officer of the NYPD employed by the City.  At all relevant times, Nieves acted towards Mr. Mallet under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and the City of New York.  This lawsuit seeks to hold Nieves liable in his individual capacity.

27.    Defendant Christopher Cuomo is the Public Administrator of Westchester County and is the proper party in a proceeding against the estate of former NYPD officer Kevin Tracy, who is now deceased.  At all relevant times, Tracy was a duly appointed and acting officer of the NYPD employed by the City.  At all relevant times, Tracy acted toward Plaintiff under color of law; in his individual capacity; and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and the City of New York.  Plaintiff asserts claims against Tracy in the latter's individual capacity, and Christopher Cuomo, as Public Administrator of Westchester County, is the proper defendant in a legal action against the decedent, Tracy.  Defendant Cuomo is a resident of the State of New York; Tracy was a resident of the State of New York at the time of his death.

28.     Defendant Donald R. Gannon is the son and representative of the estate of former NYPD officer Donald A. Gannon, who is now deceased.  At all relevant times, Detective Gannon was a duly appointed and acting officer of the NYPD employed by the City.  At all relevant times, Gannon acted toward Plaintiff under color of law; in his individual capacity; and within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and the City of New York.  Plaintiff asserts claims against Donald A. Gannon in the latter's individual capacity, and Donald R. Gannon the proper defendant in a legal action against the decedent, Donald A. Gannon Gannon.  Defendant Donald R. Gannon is a resident of the State of New York; Donald A. Gannon was a resident of the State of New York at the time of his death.

29.     Defendants John/Jane Does Numbered 3 through 20 are current or former employees of the NYPD or BXDA who acted toward Mr. Mallet under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York; and who participated in the misconduct alleged herein; but whose actual names Mr. Mallet has been unable to ascertain notwithstanding reasonable efforts to do so.  This lawsuit seeks to hold Defendants John/Jane Does Numbered 3 through 20 liable in their individual capacities.

## JURY DEMAND

30.     Mr. Mallet hereby demands trial by jury of all issues raised in this complaint.

## FACTS

**A.      The Crime and Antonio Mallet's Innocence**

31.     On September 23, 1996, Michael Ledeatte, who was in the business of stealing cars and selling them, asked his acquaintance Gregory Walker to help him deliver a car to a buyer.

32.     Mr. Walker had accompanied Mr. Ledeatte to sell stolen cars in the past.  Mr. Walker's role was backup driver—to drive in a car behind Mr. Ledeatte, who drove a stolen car; wait for Mr. Ledeatte to sell the stolen car; and then drive Mr. Ledeatte home.

33.     Mr. Walker agreed to assist Mr. Ledeatte as his backup driver on September 23, 1996.  Mr. Walker did not know who was buying the stolen car.

34.     That same day, Mr. Walker accompanied Mr. Ledeatte to Alpine Motors, an auto salvage yard in the Bronx.

35.     While waiting in the car, Mr. Walker recalls seeing Mr. Ledeatte outside the car, speaking with Mr. Mallet, whom Mr. Walker recognized but did not know by name.

36.     Mr. Walker recalls learning of Mr. Mallet's nickname, "Cee-Lo,"[2] when Mr. Ledeatte returned to the car and referred to the man he had just been speaking with by that name.

37.     As planned, in the early morning hours (around 3:00 a.m.) of September 24, 1996, Mr. Ledeatte drove a Stolen 1993 Lexus GS 300 to the Waldbaum's supermarket on Gun Hill Road in the Bronx, with Mr. Walker following the Lexus in his own car.

38.     After arriving at the supermarket, Mr. Walker parked and waited in his car, about 150 feet away from Mr. Ledeatte, who had parked and was sitting in the Lexus.

39.     From his car, Mr. Walker saw two people exit a white car parked some distance away and approach the Lexus.

40.     The two unknown people were a considerable distance away, in the dark, and wearing clothes that obscured their faces.  Mr. Walker believed they were both Black men, but he was unable to make out their faces or any identifying characteristics.

---

2.     "Cee-Lo" which was in fact Mr. Mallet's nickname, refers to a dice game.

41.     Soon after that, Mr. Walker saw one of the men moving and then heard a single gunshot.

42.     After the gunshot, the perpetrators ran to the white car, got in, and drove away.

43.     Mr. Walker then drove his car up to the Lexus and found Mr. Ledeatte fatally wounded from the gunshot.

44.     Mr. Walker drove to a payphone near the supermarket and called 911, reporting that his friend had been shot.

45.     The police and paramedics arrived at the scene shortly thereafter and transported Mr. Ledeatte to a hospital.

46.     At the hospital, an NYPD detective spoke with the emergency room doctor. The doctor, who observed two bullet holes in Mr. Ledeatte's head (evidently an entry and an exit wound), erroneously told the detective that Mr. Ledeatte had been shot twice.

**B.      The Interrogation of Gregory Walker**

47.     The police, suspecting that Mr. Walker had some role in the homicide, seized Mr. Walker's car and took Mr. Walker to the police precinct for questioning.

48.     At the precinct, the police placed Mr. Walker in a small room, handcuffed him, and interrogated him for over nineteen hours.

49.     Detective Joseph Nieves led the questioning.

50.     Detectives Donald Gannon and Kevin Tracy also participated in the interrogation.

51.     At first, Mr. Walker did not admit to having witnessed the shooting. Instead, he told detectives that he went to meet Mr. Ledeatte at Waldbaum's, and that Mr. Ledeatte had already been shot by the time Mr. Walker arrived.

52.     Mr. Walker eventually admitted that he was present for the shooting, telling detectives that he heard the gunshot but did not know who the perpetrators were.  He said he thought the two men were Black, but that he had been unable to see the men's faces because the incident occurred in the dark, it happened far away, and the men's clothing obscured their faces.

53.     One or more detectives accused Mr. Walker of lying and insisted that he must know the perpetrator's identity.

54.     One or more detectives yelled and cursed at Mr. Walker, threatening him with jail time for his own criminal activities involving stolen cars if he did not identify the perpetrator.

55.     One or more detectives suggested that if Mr. Walker would not name a perpetrator, Walker himself would become a suspect in the murder, emphasizing that he could go to prison for many years.

56.     At one point, one of the detectives grabbed Mr. Walker, pulled him off the chair on which he was sitting, and slammed him against the wall.

57.     Mr. Walker became increasingly frightened and recounted everything he could remember about the day of the incident.  In doing so, he mentioned that he and Mr. Ledeatte had seen "Cee-Lo" at Alpine Motors earlier in the day.

58.     The detectives immediately focused on "Cee-Lo," insisting that the encounter at Alpine Motors meant that Mr. Ledeatte probably arranged to sell the car to "Cee-Lo."

59.     Despite Mr. Walker's protesting that he did not overhear any conversation between Mr. Ledeatte and "Cee-Lo" at Alpine Motors, and that he could not identify Mr. Ledeatte's shooter, the detectives persisted with their threats, coercion, and abuse.

60.     After many hours, Mr. Walker finally relented and told the detectives—falsely— what they wanted to hear:  that he saw "Cee-Lo" shoot Mr. Ledeatte.

61.     Throughout the interrogation, Mr. Walker provided several oral and handwritten statements.

### 1. 3:00 a.m. Statement

62.     According to a police report, Mr. Walker gave a statement to Detective Felix Vigo at approximately 3:00 a.m. on September 24, 1996.

63.     Mr. Walker told Detective Vigo that Mr. Ledeatte was a friend who asked to meet at Waldbaum's. Mr. Walker said he arrived at the Waldbaum's parking lot at the agreed-upon time, left because he did not find Mr. Ledeatte there, and then returned after calling Mr. Ledeatte at home and not receiving an answer. Mr. Walker told police that he then drove around to the back of the supermarket and found Mr. Ledeatte, shot, in a car with the doors open.

### 2. 5:35 a.m. Statement

64.     Mr. Walker gave a handwritten statement at 5:35 a.m.

65.     This statement was signed by Mr. Walker and Detectives Nieves and Gannon.

66.     Mr. Walker's account in his second statement was more detailed than in his first and there were some discrepancies in timeline, but the two statements were largely similar.

### 3. Two 8:30 p.m. Statements

67.     Mr. Walker wrote and signed two more handwritten statements, which Detectives Nieves and Gannon also signed. The detectives recorded the times of both statements as 8:30 p.m.

68.     For the first time since the interrogation began, Mr. Walker indicated in these statements that he had been informed of his *Miranda* rights. One of the two statements indicated that Nieves gave the *Miranda* warnings.

69.     In one of the 8:30 statements, Mr. Walker said he had "back[ed] up" Mr. Ledeatte to deliver stolen cars five or more times. He explained that his job was to drive behind Mr. Ledeatte so police would not be able to identify the car Mr. Ledeatte drove.

70.     Mr. Walker still did not admit that he had witnessed the shooting.

71.     In the second statement purportedly given at 8:30 p.m., Mr. Walker likewise did not say that he had witnessed the shooting.  Instead, he maintained that when he arrived at Waldbaum's, Mr. Ledeatte had already been shot, but he saw a "small white car driving from the scene."

72.     In this statement—made after approximately seventeen and a half hours of interrogation—Mr. Walker mentioned Mr. Mallet for the first time.  According to the statement, several days earlier (September 19, 1996), Mr. Walker and Mr. Ledeatte went to Alpine, where Mr. Ledeatte "met up with a guy by the name of Celo."  The statement also included the false claim that Mr. Ledeatte told Mr. Walker that "Cee-Lo" was the prospective buyer of the stolen car.

### 4. 10:30 p.m. Statement

73.     At approximately 10:30 p.m., Mr. Walker provided his final written statement, also signed by Mr. Walker and Detectives Nieves and Gannon.

74.     In this statement, made after nearly a full day in custody, Mr. Walker included a claim that he saw the shooter and could identify him: "I then see Celo got out of the car and approach Mike."

75.     The final statement also attempted to fill in holes from the previous statements, writing, "I reconise [*sic*] Celo because I met him before."

76.     Notably, Mr. Walker also wrote that he saw "Cee-Lo" shoot "Mike *twice* in the head" (emphasis added).[3]

---

3.  This statement is a quintessential example of a "false fed fact"—*i.e.*, a statement consistent with what the police believed at the time but which later proves false.  False fed facts are one of the strongest indicators of a false witness statement or confession.  *See, e.g.*, Kings County District Attorney's Office, *426 Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York*, at 22 (July 9, 2020) (*available at* https://court.pub/426years) (calling false fed facts "[o]ne of the most powerful signs" that a statement has been tainted by police).

77. Mr. Mallet voluntarily surrendered himself to the NYPD on September 26, 1996.

## C. The *Wade* Hearing

78. A *Wade* hearing was conducted on March 8, 1999, concerning the validity of Mr. Walker's identification of Mr. Mallet.

79. Detective Tracy testified that he was neither the lead detective nor the arresting officer, and that Detective Nieves was in charge of the investigation.

80. Tracy testified that he became involved after his supervisor requested that he interview Mr. Walker.

81. Tracy testified that he obtained Mr. Walker's identification of Mr. Mallet. He testified that he began speaking with Mr. Walker at approximately 12:00 or 1:00 p.m. and "spent some amount of time with Mr. Walker, . . . trying to gain his confidence and gain his trust." He reiterated later in his testimony that "it just took a matter of time speaking with [Mr. Walker] to gain his trust and gain his confidence and at that point he made the statement to me," identifying "Cee-Lo" as the shooter.

82. Tracy testified that Mr. Walker provided a written statement at approximately 10:30 p.m.—the only statement he obtained from Mr. Walker. He did not testify about Mr. Walker's other statements, nor the police misconduct that led to obtaining that statement from Mr. Walker.

83. Tracy further testified that, upon obtaining the nickname "Cee-Lo" from Mr. Walker, Detectives Nieves and Gannon visited Alpine Motors and identified "Cee-Lo" as Mr. Mallet.

84. At the end of the hearing, the trial judge denied the suppression motion, based in large part on a finding that Tracy testified credibly. The judge said that Tracy "testified quite

candidly" and seemed "a rather experienced, able, honest, conscientious and diligent police officer."

**D.    The Trial**

85.    Mr. Mallet's trial began on March 11, 1999.  Assistant District Attorney Victor Piacentile led the prosecution on behalf of Robert T. Johnson, then Bronx District Attorney.

86.    Mr. Walker was the prosecution's only identification witness and only evidence linking Mr. Mallet to the crime.

87.    No physical, forensic, ballistic, or other evidence linked Mr. Mallet to the crime.

88.    No evidence of any motive was ever offered.

89.    Mr. Walker identified Mr. Mallet as the shooter, despite testifying that he (Mr. Walker) (1) was approximately 140 feet away from the scene, (2) was unable to tell from that distance whether the second perpetrator had facial hair, and (3) never gave police a description of the second perpetrator.

90.    Mr. Walker testified that he heard only one gunshot.  He also testified that he previously said he heard two shots because the police told him that.

91.    Detective Tracy testified that Detective Nieves was the officer in charge of the investigation and the one who advised Mr. Walker of his *Miranda* rights.  He testified, as he had at the *Wade* hearing, that he interviewed Mr. Walker at the request of his commanding officer.

92.    Tracy said he spoke with Mr. Walker on and off from approximately 1:00 p.m. to 10:30 p.m., and it took about seven to eight hours "to get the truth."

93.    Tracy testified that Mr. Walker ultimately provided a written statement that the two of them, along with Detectives Nieves and Gannon, signed at about 10:30 p.m.

94.     Neither Tracy nor Walker testified about Mr. Walker's other statements, nor the coercion and abuse that led to the 10:30 p.m. statement and the implication of Mr. Mallet.

95.     Detectives Tracy, Nieves, and/or other NYPD officers withheld—from the BXDA, the defense, and the trial court—records that contradicted Tracy's testimony and would have undermined the 10:30 p.m. statement, as well as information that would have undermined Mr. Walker's inculpatory testimony.

96.     The only other witnesses at trial were the police officers who responded to the crime scene (one of whom described the scene as "dark") and a doctor from the Office of Chief Medical Examiner (who testified that a single gunshot caused Mr. Ledeatte's death).

**E.     The Verdict and Sentencing**

97.     On March 18, 1999, the jury returned a guilty verdict.

98.     At sentencing, Mr. Mallet said: "I am innocent.  That is it.  One case has to be proven.  Until then I have to wait it out.  That is it.  I am innocent."

99.     The trial judge lauded the prosecution's strategy and Detective Tracy's testimony, remarking that it "was show[n] rather clear to the jury this was an experienced detective [Tracy] who realized from the very beginning that this witness [Walker] was not being forthright.  Just kept probing until what *he thought* was the truth" (emphasis added).

100.     The judge commented that this "came across [as] very persuasive to the jury," adding that "the rapidity of the verdict was astonishing.  The jury went out.  Jury came back and made a verdict which is that quick.  We were all shocked."

101.     The judge nonetheless expressed doubt about Mr. Mallet's guilt, noting: "That doesn't mean he's guilty.  That is the tragic aspect.  I don't know if he is guilty, having done this

too long I just don't know.  I think the verdict [is] substantially warranted by the evidence that was

adduced in this case.  Otherwise I would set it aside."

102.    The Court sentenced Mr. Mallet to 20 years to life in prison.

103.    Mr. Mallet was released on parole in April 2019 after serving 20 years in prison.

104.    After being released on parole, Mr. Mallet spent years still in the legal custody of

the New York State Department of Corrections and Community Supervision, whereby his liberty

was significantly curtailed and he faced the constant threat of being returned to prison.

**F.    Direct Appeal and Other Prior Post-Conviction Litigation**

105.    In March 2000, Mr. Mallet directly appealed his conviction before the Appellate

Division, First Department.  The Appellate Division affirmed the judgment of conviction on

December 12, 2000.  *People v. Mallet*, 278 A.D.2d 51 (1st Dep't 2000).  Mr. Mallet was denied

leave to appeal to the Court of Appeals on April 6, 2001.  *People v. Mallet*, 96 N.Y.2d 802 (2001).

106.    Subsequently, Mr. Mallet fought his conviction through various other

post-conviction petitions and motions.  These included his: (1) petition for writ of coram nobis,

dated May 14, 2002; (2) first motion to vacate his conviction, dated August 11, 2003; (3) petition

for writ of habeas corpus, dated January 5, 2005; (4) second motion to vacate his conviction, dated

August 17, 2006; (5) motion for an order authorizing the United States District Court for the

Southern District of New York to consider a successive petition for writ of habeas corpus, dated

January 11, 2008; (6) third motion to vacate his conviction, dated June 10, 2008; (7) fourth motion

to vacate his conviction, dated October 21, 2011; (8) petition for successive habeas corpus relief,

dated September 24, 2013; and (9) motion for leave to file a successive habeas petition, dated

September 24, 2013.  All such petitions and motions were denied.

107.    The BXDA, through Appeals Bureau attorneys Noah J. Chamoy and Nancy D. Killian, consistently opposed Mr. Mallet's applications for post-conviction relief, insisting that Mr. Walker testified truthfully and there were no due process violations at Mr. Mallet's trial.

108.    Through the years of his post-conviction efforts to prove his innocence, Mr. Mallet repeatedly sought documents and information from the NYPD and BXDA, both of which consistently maintained that they had no favorable information or evidence of Mr. Mallet's innocence. The NYPD denied Mr. Mallet's requests under the Freedom of Information Law and stonewalled his efforts to obtain the evidence that would ultimately exonerate him.

109.    On October 17, 2014, Mr. Mallet filed his fifth motion to vacate his conviction. This motion was based on, *inter alia*, newly discovered evidence of an unsworn, audio-recorded statement from Mr. Walker, who told Mr. Mallet's investigator that the men he saw commit the crime had hoodies on, that the police "roughed him up," and that he was not "100 percent sure" of his identification.

110.    The court denied the motion on April 2, 2015, finding that: (1) Mr. Walker's audio-recorded statement did not differ sufficiently from his trial testimony, (2) Mr. Walker did not make an "unequivocal" recantation, (3) the new evidence was "unsworn," and (4) Mr. Mallet did not bring the motion with due diligence. Mr. Mallet appealed.

111.    On January 22, 2019, the Appellate Division affirmed the Supreme Court's decision, holding that Mr. Mallet's claims failed because "they were not supported by any sworn, nonhearsay allegations by the source of the proffered new evidence, who was the sole eyewitness who testified at trial." *People v. Mallet*, 168 A.D.3d 542, 543 (1st Dep't 2019). The Appellate Division also held that the motion had not been made with due diligence.

### G.     The 2019 Motion to Vacate

112.     On October 15, 2019, Mr. Mallet filed the 2019 440 Motion, based in part on a sworn, written statement from Mr. Walker, dated July 6, 2019, in which Mr. Walker recanted his testimony and revealed that his identification of Mr. Mallet was false and the product of police coercion.

113.     In his affidavit, Mr. Walker confirmed that he witnessed the shooting from approximately 150 feet away and he was unable to see the faces of the two men who approached Mr. Ledeatte's car.  He also confirmed that he heard only one gunshot.

114.     For the first time, Mr. Walker detailed the police misconduct that led to his false identification.

115.     Mr. Walker described the detectives getting "very angry" and accusing him of lying when he denied knowing who the perpetrators were.

116.     Mr. Walker also described the detectives repeatedly threatening him with arrest and prosecution, telling him that he "was not going to walk out of the police station," and "was going to go down for the stolen car" if he did not identify the shooter.  Mr. Walker wrote that the detectives made clear to him that he was "going to tell them who did the shooting or [he] was going to jail."

117.     Mr. Walker also wrote that the detectives were verbally and physically violent with him, yelling and cursing at him and, at one point, slamming him against a wall, which Mr. Walker described as "painful" and frightening.

118.     Mr. Walker discussed in his affidavit how, upon his mentioning "Cee-Lo," the detectives spent "hours and hours" "threatening" and "intimidating" Mr. Walker into saying that he saw "Cee-Lo" shoot Mr. Ledeatte.

119.     Mr. Walker described feeling "terrified" and "exhausted" and thinking that "the only way [he] could get out of this was to tell the detectives what they wanted to hear."

120.     Mr. Walker recounted the detectives' rejecting his statement that the shooter was "probably" "Cee-Lo," insisting that "probably is not good enough" and that he "needed to say it was ['Cee-Lo'] for sure."

121.     Mr. Walker revealed that the detectives instructed him on what details to include in his statements. For example, the detectives told Mr. Walker to say Mr. Mallet shot Mr. Ledeatte two times—even though, as he acknowledged later, he heard only one gunshot.

122.     The detectives' intention in doing so was to falsely conform Mr. Walker's account to fit what they (erroneously) believed were the facts of the case.

123.     Later, when Mr. Walker was called to testify at Mr. Mallet's trial, the detectives again coached him on how to testify. By that time, however, the detectives had learned that Mr. Ledeatte had been shot only once, and they accordingly instructed Mr. Walker to testify that he heard only one gunshot.

124.     From the interrogation through trial preparation, the detectives continue to instill fear in Mr. Walker by falsely telling him that his "life was in danger" for having witnessed the murder, that Mr. Mallet was a "violent and dangerous person" with a "long criminal record," and that Mr. Mallet was out on bail and "might try to hurt [Mr. Walker] or [his] family" if Mr. Walker did not cooperate with the detectives. The detectives had no factual basis for these statements.

125.     Mr. Walker wrote that the detectives also tried to reassure him that he was "doing the right thing and that ['Cee-Lo'] was definitely guilty," falsely claiming that "there was a lot of evidence against ['Cee-Lo'] and they knew ['Cee-Lo'] killed Mike, and that Mr. Walker's testimony "was just a small part of it."

126.    In his affidavit, Mr. Walker discussed his motivation for finally coming forward with his recantation.  He explained that, after the trial, he moved to Florida and ended his involvement in criminal activities.  He found religion and became deeply involved in the church. After years of expressing his doubts but never fully recanting his testimony, Mr. Walker agreed to tell the whole truth once he learned that the detectives had falsely represented to him both that there was ample evidence against Mr. Mallet other than Mr. Walker's testimony, and that Mr. Mallet was a dangerous criminal who tried to hurt Mr. Walker before the trial.

127.    Mr. Walker wrote the affidavit to "set the record straight" and "do what is right and set an example for other people who were put in a position of being forced to wrongfully accuse another person of a crime."

128.    Mr. Walker's affidavit was corroborated by an expert report by Dr. Gregory Loftus, one of the country's leading experts in the field of perception and memory.

129.    Addressing Mr. Walker's trial testimony, Dr. Loftus opined that it would have been impossible for Mr. Walker to identify the shooter from a distance of 140 feet away, in a darkly lit area, in the middle of the night.  The evidence, Dr. Loftus concluded, strongly indicates that these conditions were sufficiently poor that Mr. Walker was using his scotopic visual system, which is incapable of detecting the fine detail necessary to encode a person's appearance, and whose limitations are exacerbated when used at night.

130.    Dr. Loftus further opined that suggestive post-event information can bias a witness's memory of an event, and that eyewitnesses can and have strongly and confidently—yet falsely—identified actually innocent individuals as perpetrators of crimes.

131.    In an interim decision dated December 1, 2020, Justice Ralph Fabrizio ordered a limited hearing to determine whether Mr. Mallet had exercised due diligence to obtain Mr. Walker's affidavit.

132.    Before the limited hearing began, Mr. Mallet moved to disqualify District Attorney Darcel Clark pursuant to Judiciary Law § 17 because she had previously presided as a judge over Mr. Mallet's post-conviction proceedings.  Mr. Mallet also moved to appoint a special district attorney pursuant to County Law § 701.

133.    The BXDA vigorously opposed the motion and fought for months to prevent District Attorney Clark's replacement.

134.    Only after Justice Fabrizio asked the prosecutor arguing the motion to speak to his superiors and determine whether they actually wanted the court to rule on the motion (strongly implying that he intended to decide the motion against the BXDA), did the BXDA finally consent to the motion, on April 21, 2021.

135.    In late 2021, the WCDA accepted the appointment as special district attorney on the condition that the matter be referred in the first instance to the CRU.  Mr. Mallet consented, and the WCDA, in turn, agreed with Mr. Mallet's proposal that his 2019 440 Motion be held in abeyance pending the outcome of the conviction review process.

### H.    The Joint Reinvestigation with the Westchester County District Attorney's Office

136.    The joint, collaborative reinvestigation of Mr. Mallet's case began in March 2022 and lasted almost two and a half years.

137.    Evidence obtained through the joint reinvestigation is set forth below. The following summary discusses a substantial amount, but not all, of the information reviewed and exchanged between the CRU and Mr. Mallet's counsel.

### *1. Interviews of Gregory Walker*

138.    The CRU interviewed Mr. Walker both in person and over the phone.  Mr. Walker was represented by counsel during the interviews.

139.    Consistent with his prior audio-recorded statement and affidavit, Mr. Walker told the CRU he was unable to see and identify Mr. Ledeatte's shooter.  Mr. Walker explained that the incident occurred at night, he was parked far away from Mr. Ledeatte, and the shooter wore clothing that obscured his face.

140.    Mr. Walker's reports of police coercion were also consistent with his prior statements.  Mr. Walker described being taken to a small, windowless room at the precinct and being interrogated for what felt like forever.  He said the detectives became hostile when he insisted that he did not know who the shooter was, threatening him with charges for the stolen car and insinuating he was involved in the shooting.  For example, detectives asked Mr. Walker whether they would find his fingerprints on the car.  Mr. Walker also recounted, as he had in his prior statements, that one of the detectives became physically violent with him, yanking him out of his chair and slamming him against a wall.

141.    Mr. Walker told the CRU that the detectives praised him once he agreed to identify Mr. Mallet.  He said the detectives claimed they had ample other evidence against Mr. Mallet and that Mr. Walker's identification simply corroborated what they already knew.

### *2. Interviews of Kelvin Rosado*

142.    The CRU and Mr. Mallet's counsel separately interviewed Kelvin Rosado, who in 1999 worked as a manager at Alpine Motors.

143.    Mr. Rosado described an encounter with former Detective Nieves during the homicide investigation into Mr. Ledeatte's death, including Nieves's efforts to coerce Mr. Rosado to make false inculpatory statements against Mr. Mallet.

144. During his interview with Mr. Mallet's counsel, Mr. Rosado discussed his interrogation by Detective Nieves. He described Nieves as a "sneaky guy" who played "dirty" by trying to coerce Mr. Rosado into falsely saying he had seen Mr. Mallet and Mr. Ledeatte argue at Alpine.[4] Mr. Rosado described Nieves in similarly vivid terms to the CRU.

145. Mr. Rosado recounted that Nieves repeatedly demanded Mr. Rosado's truck, giving Mr. Rosado the impression that Nieves intended to impound the truck to use as leverage to pressure Mr. Rosado into saying what Nieves wanted him to say.

146. Mr. Rosado further described how Nieves became "upset" and "pissed off" when Mr. Rosado refused to adopt the detective's false narrative.

147. Mr. Rosado explained that Nieves ended the questioning only when Mr. Rosado's lawyer appeared at the precinct.

148. Mr. Rosado's description of Detective Nieves—as an officer willing to try to threaten and intimidate a witness into saying what he wanted them to say, regardless of its truth— corroborated Mr. Walker's description of the detectives.

### 3. Interview of Detective Joseph Nieves

149. The CRU also interviewed former Detective Nieves.

150. Nieves confirmed that he was the lead detective on the case and that he did not testify at Mr. Mallet's trial, having retired from the NYPD the year before.

151. Nieves recalled his partner, Detective Gannon, but did not remember Detective Tracy.

152. Nieves admitted that he did not think Mr. Walker had anything to do with the crime.

---

4. A description of an argument between Mr. Mallet and Mr. Ledeatte could have been used as evidence of motive—an element strikingly absent from the case against Mr. Mallet.

153.    He further admitted that he put pressure on Mr. Walker and that what triggered Mr. Walker's identification was the detectives' suggestion that Mr. Walker was involved with the crime.  Specifically, he told Mr. Walker that, "if it wasn't someone else, it might be you," and that was when Mr. Walker "gave it up."  Nieves said that the detectives "put pressure on him" and that was when Mr. Walker named Mr. Mallet.

### 4. Discovery of Two Versions of Gregory Walker's 10:30 p.m. Statement

154.    During the reinvestigation, the CRU discovered at least two different versions of Mr. Walker's 10:30 p.m. statement to the police.

155.    One version of the document bore Detective Tracy's signature (below all other signatures), but on another version Detective Tracy's signature was absent.

156.    When interviewed by the CRU, the trial prosecutor recalled no discrepancy between the versions signed and unsigned by Tracy.  Mr. Mallet's trial attorneys likewise had no such recollection.

157.    The CRU found no evidence that the signed version was ever disclosed to the defense at the time of Mr. Mallet's trial.

158.    Had trial counsel been aware of such a discrepancy, however, he could have used it to undermine both Tracy's credibility and Walker's incriminating statements.

### 5. Detectives Joseph Nieves and Kevin Tracy's Histories of Misconduct

159.    The CRU obtained from the NYPD certain disciplinary records regarding Detectives Nieves and Tracy.  The CRU interviewed several of the complainants who reported allegations against Nieves, and questioned Nieves about the allegations as well.

160.    Although many of the complaints against Detectives Nieves and Tracy pre-dated March 1999, no information or documents about the officers' disciplinary histories were ever disclosed to Mr. Mallet at the time of trial.

161.     No supervisor at the NYPD took action to prevent Detectives Nieves and Tracy from continuing their pattern of misconduct and from causing future constitutional violations, including those Mr. Mallet suffered.

162.     Nieves, Tracy, and other NYPD employees were aware of the officers' disciplinary histories but did not disclose the information to the BXDA.

### a. *Allegations Undermining Both Detectives' Credibility*

163.     According to the records and information the CRU obtained, both Detective Nieves and Detective Tracy faced multiple allegations bearing on their credibility.

164.     For example, one complainant alleged that Nieves seized his video shop and began running a video counterfeiting business from the shop.  The NYPD investigated the allegation and found it to be "partially substantiated."

165.     Nieves was arrested and suspended for selling counterfeit materials.  Then, the NYPD restored Nieves to active duty status and disclosed no information about his misconduct to any criminal defendant in any case in which Nieves was involved—including Mr. Mallet.

166.     The CRU interviewed the complainant from that case, who confirmed the allegations.

167.     Another complainant alleged that Nieves created a forged signature to fraudulently obtain the title to a house.

168.     The CRU spoke with the complainant, who reported that Nieves urged her to sign over her interest to him, but she refused because something did not "feel right" about him.  The complainant said her siblings had previously signed over their interests to him, and warned her not to do the same because Nieves "made promises but didn't deliver."  The complainant confirmed that she "never signed anything" and instead "walked away," and that the signature on the deed was not hers.

169.    Other complaints made against Nieves involved allegations that he stole civilian property, failed to voucher or return arrestees' property, and forcibly broke into an NYPD lieutenant's garage and unlawfully operated an auto repair business on the property.

170.    A few years ago, in California, Nieves shot and killed a man with whom he had a business dispute over a marijuana growing operation.  Nieves was charged with murder, but the charges were dismissed without prejudice.  The case remains under investigation by state and local prosecutors in California.  In the meantime, Nieves is working on developing a book and television show about a "tangled web of police corruption and cold-blooded murder," called "Smoke and Badges."  *See, e.g.*, *https://www.smokeandbadges.com*.

171.    Allegations surrounding Nieves's recent homicide—which include claims that Nieves was attempting to force the victim out of their illicit business venture—are consistent with other, substantiated allegations that Nieves faced while a New York City police officer.

172.    Tracy, in turn, faced allegations that he stole money, tried to extort an arrestee into giving him $2,000 in exchange for release, made unlawful arrests, committed robberies and burglaries, and lied about the circumstances of losing his gun.

173.    With respect to the lost firearm, Tracy was placed on "modified assignment" and issued charges and specifications (one of the severest forms of NYPD discipline) for failing to truthfully report the loss.

### b.  *Allegations Involving Harassment, Coercion, and Physical Violence*

174.    Detectives Nieves and Tracy also had complaints lodged against them for harassment, coercion, substance abuse, and physical violence.

175.    The complainant whose video store Nieves allegedly stole reported that Nieves later confronted the complainant and pushed and threatened to kill him.

176.    During his interview with the CRU, the complainant said that Nieves threatened to have the complainant arrested and instructed the complainant not to return to New York.  The complainant further stated that Nieves was known to have a bad temper and to use intimidating policing tactics.

177.    Another complainant similarly reported to the CRU that Nieves was a "bully" who would bang on doors and bring around large dogs to intimidate her and the other tenants.

178.    Meanwhile, Tracy faced multiple allegations—at least one of which was found to be substantiated by the NYPD—of engaging in fights and assaulting individuals.

179.    Tracy was also suspended after he allegedly harassed and threatened his girlfriend. Those allegations were also determined to be substantiated.[5]

180.    Tracy was on modified assignment at the time he participated in the investigation that led to Mr. Mallet's arrest and conviction, as a result of numerous episodes of his abusing alcohol and engaging in violent and criminal behavior.

## I.    The Motion to Vacate and the Trial Court's Decision

181.    Following the reinvestigation, on September 16, 2024, Mr. Mallet filed a motion to vacate judgment of conviction on the ground of newly discovered evidence pursuant to CPL Section 440.10(1)(e).  Mr. Mallet also moved to dismiss the indictment against him pursuant to CPL Section 210.40.

182.    That same day, the WCDA filed an Affirmation in Support of Defendant's Motion to Vacate the Judgment of Conviction on Grounds of Newly Discovered Evidence Pursuant to

---

5.    There were several other complaints against Tracy that, while postdating Mr. Mallet's 1999 trial, bear noting because of the concerning nature of the allegations and similarities with Mr. Mallet's case.  In 2000, Tracy allegedly harassed a woman about a case and threatened to drag her down to police headquarters despite repeated claims that she was out of the state when the incident occurred.  In 2003, he faced allegations (found to be partially substantiated) that he committed perjury at a trial in a murder case, including about a statement the complainant-defendant allegedly made and about certain video evidence.

CPL Section 440.10(1)(g), and the People's Motion to Dismiss Pursuant to CPL Sections 210.20, 210.40 and 440.10(4).

183.    The WCDA wrote that, "[d]uring the course of its more than two-year investigation, the CRU scrutinized the hearing and trial transcripts and the BXDA case files, interviewed more than 20 witnesses, re-examined the physical evidence, visited the crime scene, consulted with three federal prosecutor's offices, and obtained NYPD internal affairs records."

184.    The WCDA noted that the case was "a single-eyewitness identification case" in which "[t]he sole eyewitness has credibly recanted and any other evidence that Mallet was present at the time of the crime is lacking."

185.    The WCDA also observed that "the extent and seriousness of the reports against Nieves—specifically the allegations of intimidation and deception—many of which were corroborated in detail by the complainants in interviews with the CRU, is notable."

186.    The prosecution conceded that Mr. Walker's credible recantation, together with "the lack of any other evidence implicating Mallet in th[e] crime," required vacatur of the conviction and dismissal of all charges.

187.    On September 30, 2024, the Trial Court granted the 440 Motion under CPL Section 440.10(1)(g), vacated Mr. Mallet's conviction, dismissed the indictment against him, and sealed the case.

**J.      The City of New York's Deliberate Indifference to Police and Prosecutorial Misconduct, and Its Failure to Train, Supervise, and Discipline Its Employees**

188.    Mr. Mallet's wrongful conviction and imprisonment do not represent a unique or outlier miscarriage of justice in an otherwise functioning law enforcement system.  To the contrary, during the relevant period, policymakers for the NYPD, acting on behalf of Defendant the City of New York, engaged in the following misconduct, which was reflected, and led to the wrongful

conviction, in Mr. Mallet's case: acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; and implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of City officials—including, *inter alia*, to properly document and disclose information favorable to the defense, and not to fabricate evidence by coercing false statements and testimony.

189.    Reports from several independent bodies demonstrate that Defendant the City of New York, during the relevant period, was plagued by institutional deficiencies that allowed a wanton and reckless culture to develop within the NYPD.  This culture allowed employees of the NYPD to violate constitutional rights of the citizens of the City of New York without disciplinary risk or repercussions.

190.    On July 7, 1994—just a few years before Mr. Mallet's prosecution—the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Commission") issued a report (widely referred to as the "Mollen Report") that addressed corruption in the NYPD.[6]  The Mollen Report investigated the 1980s and 1990s through the date of the report's publishing.  Importantly, the Mollen Report described the state of corruption in the present tense and stated that the Commission's "findings raise significant concerns about . . . the potential for these problems to grow without sustained vigilance and oversight."  Mollen Report at 1.

191.    The Mollen Report further noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets and undermines the credibility of police in the courtroom."  *Id.* at 36.  The Mollen Report described

---

6.    The Mollen Report is available at http://bit.ly/3qyKkKv.

police falsifications as "probably the most common form of police corruption facing the criminal justice system," *id.*, and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful," *id.* at 41.

192.    The Commission noted that police falsifications were "widely tolerated by corrupt and honest officers alike, as well as their supervisors." *Id.* at 40. It further observed that it was "not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch," "[n]or . . . of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification." *Id.* at 41. The Commission further found that "[t]here is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics," *id.* at 41-42.

193.    The Mollen Report concluded that "[o]fficers and their immediate supervisors are not the only culprits in tolerating falsifications . . . . [T]he Department's top commanders must share the blame." *Id.* at 41. Given this situation, the Mollen Report determined that "successful enforcement of command accountability requires a complete reinvention of the systems for enforcing it." *Id.* at 79.

194.    The Mollen Report also reported that "this same tolerance is sometimes exhibited among prosecutors. Indeed, several former and current prosecutors acknowledged – 'off the record' – that perjury and falsifications are serious problems in law enforcement that . . . are ignored." *Id.* at 42.

195. The Mollen Report also addressed police brutality, noting that "corruption and brutality are often linked in a variety of ways" and that "officers who are corrupt are more likely to be brutal." *Id.* at 44, 46.

196. The Mollen Report used the example of one particularly violent police officer to illustrate the high rates of police brutality and the disturbing infrequency with which that brutality was ever reported: "[d]espite [a former officer's] admission at [the Commission's] public hearings to hundreds of acts of open brutality spanning his career as a New York City Police Officer, only one allegation was ever filed against him for excessive force. And it was not from a police officer." *Id.* at 48. "This pattern," the Report continues, "was similar for most of the violent and corrupt officers th[e] Commission learned about." *Id.*

197. The Commission also observed that "[o]fficers are not the only ones who tolerate brutality," but that "[t]his tolerance, or willful blindness, extends to supervisors as well." *Id.* at 49.

198. The Commission concluded that "the Department has refused to recognize brutality as a serious occupational hazard and failed to recognize its link to corruption. Integrity training inadequately addressed issues of brutality or brutality tolerance; intelligence-gathering efforts in the brutality area were negligible; discipline was lax; command accountability was rarely enforced in this area; and information on corruption and brutality was rarely analyzed together." *Id.* at 50.

199. The Mollen Report also highlighted the pervasive "code of silence" at the NYPD, describing the "pervasiveness of the code of silence" as "alarming" and noted the "grave consequences for violating it: Officers who report misconduct are ostracized and harassed; become targets of complaints and even physical threats; and are made to fear that they will be left

alone on the streets in a time of crisis. This draconian enforcement of the code of silence fuels corruption because it makes corrupt cops feel protected and vulnerable." *Id.* at 53.

200. The Commission found that "[t]he inculcation of police culture [around the code of silence] begins early in police officer careers, as early as the Police Academy" and that "while still recruits, police officers learn the harsh lessons of violating the code of silence." *Id.* at 55. Accordingly, it concluded, "[i]f the Department ever hopes to make lasting improvements in corruption control, it must do something it has failed to do in recent history: acknowledge that the code of silence exists and take steps to overcome it." *Id.* at 57.

201. A court in this Circuit has already found that the Mollen Report "provides powerful evidence that there was a custom and practice within the police department of tolerating corruption" and "characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the police commissioner.'" *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014). Accordingly, the court found that "[t]he Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes[.]" *Id.* at 191.

202. The lack of discipline documented in the Mollen Report continues to this day, as demonstrated by a report released by The Independent Panel on the Disciplinary System of the New York City Police Department (the "Panel"), chaired by the Honorable Mary Jo White, the Honorable Robert L. Capers, and former United States District Court Judge for the Southern District of New York Barbara S. Jones.[7] The Panel's report (the "Panel Report"), released in January 2019, made specific note of the endemic culture of false testimony in the NYPD, which was repeatedly "brought to the Panel's attention." Panel Report at 38.

---

7. The Panel Report is available at https://www.independentpanelreportnypd.net.

203.    The Panel noted that while "the Patrol Guide provisions . . . expressly forbid officers from lying in connection with their duties, numerous stakeholders have expressed concerns about lax enforcement and practices that enable bad actors to escape accountability and avoid the presumptive termination penalty." *Id.* at 39.  The Panel "share[d] the concern that the Department does not do so and treats false statement cases too leniently," *id.* at 40, particularly as several stakeholders "told the Panel that the Department does not charge officers with making false statements at all when the facts would support such a charge," *id.*, and another "stakeholder told the Panel that certain historic practices may contribute to a culture in which false statements are condoned," *id.* at 41.  The Panel further observed that these practices "have been a 'focal point' in the [Commission to Combat Police Corruption]'s annual reports for over 20 years, from 1996 to the present." *Id.* at 40.

204.    Furthermore, in 2009, the New York State Bar Association's Task Force on Wrongful Convictions (the "Task Force") released an investigative report covering 53 cases (the "NYSBA Report").[8]  The Task Force found that "government practices" contributed to more than 50% of the wrongful conviction cases studied.   NYSBA Report at 19.  These practices include the use of false evidence and the failure of the prosecutor to disclose *Brady* material.  *Id.*  Both practices contributed to Mr. Mallet's wrongful conviction, where: (a) Mr. Mallet's conviction was based solely on Mr. Walker's false statement procured by Nieves, Tracy, and/or Gannon and (b) this misconduct was not disclosed to the defense.

205.    The Task Force recommended that police, like prosecutors, be trained and supervised in the application of *Brady* and truthful evidence rules.  *Id*. at 37-38.  Indeed, the Task

---

8.    As noted in the NYSBA Report, available at https://bit.ly/4iNlD22, the cases spanned from 1964 to 2004, a forty-year period that includes Mr. Mallet's arrest and conviction.  Most of the cases were from New York City.  Several were from the Bronx.  *See* NYSBA Report at 186.

Force observed that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show [that *Brady* violations] still occur[]." *Id.* at 26 (collecting New York cases). The Task Force also noted the importance of the police in upholding *Brady* obligations, given that "[p]rosecutors' access to exculpatory evidence known to the police depends ultimately on the willingness of the police to record, preserve, and reveal such evidence." *Id.* at 37-38.

206. As discussed below, despite the significance of the *Brady* rule, the NYPD had no appropriate training, supervisory, or disciplinary procedures in place in the time leading up to Mr. Mallet's arrest, indictment, trial, or post-conviction litigation.

207. These investigative reports revealed a laissez-faire NYPD regime and a stunning pattern of falsification. These findings are illustrated by the conduct of the Individual Defendants, particularly Detectives Tracy and Nieves, which is described *supra* at ¶¶ 49-60, 159-180.

208. Given the number of known instances of misconduct that occurred and were documented by the NYPD, it is a near certainty that the NYPD knew of their deliberate or reckless conduct and either encouraged it or failed to adequately train, supervise, or discipline for said conduct.

209. This enabling culture permitted and caused the wrongful prosecution and conviction in Mr. Mallet's case.

210. Detectives Tracy and Nieves are not isolated cases. Additional proof of a culture of unconstitutional conduct in the NYPD at that time exists in the voluminous record of other cases that demonstrates that other detectives felt free to act similarly. This pattern of behavior supports a clear inference that unscrupulous tactics were considered normal, acceptable, and encouraged within the NYPD, as demonstrated in the following cases:

a. **David Bryant:** In 1976, David Bryant was convicted of the 1975 murder of an eight-year-old girl in an apartment building in the Bronx. At trial, the state relied on the testimony of 10-year-old Billy Tyler, who testified to having seen Mr. Bryant with the victim twice on the night that she died. In 2014, Mr. Tyler recanted his statement, saying that his testimony had been fabricated at the behest of NYPD officers, who told him what to say, told him his testimony would make him a hero, and told him that he was in danger from Mr. Bryant's family. Mr. Bryant was released in 2018 after filing a successful petition a writ of habeas corpus in U.S. District Court for the Southern District of New York, and the BXDA dismissed the charges against him in 2019.

b. **David McCallum and Willie Stuckey:** In October 1985, NYPD Detective Joseph Butta allegedly coerced false confessions from David McCallum and Willie Stuckey through the use of physical intimidation, including slapping Mr. McCallum in the mouth and drawing blood; threats of physical intimidation, including picking up a chair and threatening to hit Mr. McCallum across the head with it; and promises of leniency, including telling Mr. Stuckey that he could go home if he only cooperated ("Q. And what did he tell you would happen to you if you said those things? A. He told me he was going to call my house and he's going to let me go."; "Q. And right after you made the tape, did you think you were going home? A. Yes."). Both men recanted immediately and, tellingly, both confessions contained inconsistencies, false fed facts, and fabrications. Messrs. McCallum's and Stuckey's motions to vacate their convictions were granted on October 15, 2014.

c. **James Jenkins:** In the 1987 trial of James Jenkins, Justice Francis X. Egitto condemned NYPD Detective Louis Scarcella for his manipulative conduct of an identification procedure. This included allowing the witnesses to mingle together and telling the witnesses, "We have the guy that committed the murder."

a. **Shabaka Shakur:** In 1988, Shabaka Shakur was arrested after two of his friends were shot and killed in Brooklyn. Mr. Shakur was convicted in large part based on a fabricated statement falsely attributed to him by the NYPD. In vacating Shabaka Shakur's conviction in May of 2015, Judge Desmond Green observed that Scarcella has a "propensity to embellish or fabricate statements."

d. **Antonio Yarbough and Sharrif Wilson:** On June 18, 1992, 18-year-old Antonio Yarbough came home to find that his mother, 12-year-old sister, and 12-year-old family friend had been savagely tied up, stabbed, garroted with electrical cords, and murdered. Mr. Yarbough, who reported the crime to the police, and his 15-year-old friend Sharrif Wilson, confessed to the murders later that day. Each was convicted (in Mr. Yarbough's case after a second trial, the first ending in a mistrial) and served nearly 22 years in prison before DNA evidence ruled both men out as the perpetrators. In 2014, a Kings County Supreme Court Justice granted their motion to vacate, absent objection from the KCDA. According to a federal civil rights complaint filed by Mr. Yarbough, the NYPD allegedly used a combination of physical and psychological coercive techniques to secure the confessions, the latter including sleep deprivation, false evidence ploys, and false promises of leniency, including allegedly telling Mr. Wilson that they would let him go home if he would only tell them what they wanted to hear.

e. **Colin Warner:** Colin Warner was convicted in 1982 of the 1980 fatal shooting of Mario Hamilton. The victim's brother, Martell Hamilton, asserted that a member of the NYPD pressured him into picking out a photograph of Mr. Warner as someone he may have seen near the scene of the crime. Mr. Warner's motion to vacate his conviction was granted in 2001.

f. **Barry Gibbs:** Barry Gibbs was convicted in 1988 of the murder of Virginia Robertson. Mr. Gibbs was exonerated in 2005 after the sole eyewitness, David Mitchell, recanted his line-up and trial identifications of Mr. Gibbs. Mitchell asserted that NYPD Detective Louis Eppolito had threatened his family if he did not identify Mr. Gibbs.

g. **Derrick Deacon:** Derrick Deacon was convicted in 1989 of the murder that same year of Anthony Wynn. Colleen Campbell was an eyewitness who saw the shooter in the hallway of the apartment building where the shooting took place, and who gave a physical description of him to the NYPD. When the NYPD identified Mr. Deacon as a suspect, Campbell told police the shooter was not Mr. Deacon, a man she knew from the neighborhood. Although she was called as a defense witness at trial to testify to that effect, she wavered on the stand and said she could not be sure. Years later, she testified in exoneration proceedings that the NYPD pressured her prior to her testimony, threatening her with the loss of her children if she did not cooperate with them. Although Mr. Deacon lost his motion to vacate at the Supreme Court level, the Appellate Division reversed, the case was re-tried in 2013, and he was acquitted.

h. **Jonathan Fleming:** Jonathan Fleming was convicted in 1990 of the 1989 fatal shooting of Darryl Rush. Jacqueline Belardo, a key prosecution witness, testified at Mr. Fleming's trial that she witnessed the shooting and recognized Mr. Fleming as the shooter. That testimony was false. Belardo later recanted her testimony and asserted that she agreed to identify Mr. Fleming at trial only after police officers threatened her with jail time on an unrelated felony larceny charge. Her recantation was corroborated by evidence of that larceny arrest and the charge's subsequent dismissal. Mr. Fleming's motion to vacate his conviction was granted in 2014.

a. **Howe Burton:** In 1991, Howe Burton was convicted of the 1989 murder of his mother, Keziah Burton, in their home in the Bronx. During a police interrogation, then-16-year-old Burton was coerced to falsely confess to his mother's murder by two detectives who had produced false confessions in another homicide case just three months prior. While being interrogated, he was threatened and fed false facts that appeared in his confession (e.g., that he stabbed his mother once, which lined up with what the police initially thought, even though she was actually stabbed twice). In addition, the NYPD initially focused on Burton because he had apparently lied about attending school that day; eventually, police officers uncovered school records that showed he had actually been in school as he said. These records were never disclosed to the defense, and Howe Burton was subsequently exonerated.

211. Criminal and civil cases demonstrating the unconstitutional patterns, policies, customs, and usages of the NYPD include numerous cases in which the NYPD violated its *Brady*

obligations, and the NYPD turned a blind eye to officer dishonesty, as demonstrated in the following cases:

- *People v. Cortez*, 149 Misc. 2d 886 (Crim. Ct. Kings Cty. 1990) (dismissing indictment after finding that police violated "spirit" of *Brady* by intentionally destroying tape they were court-ordered to preserve);

- *People v. Moss*, 176 A.D.2d 826 (2d Dep't 1991) (reversing drug sale conviction and ordering new trial for *Rosario* violations, where officers lost or destroyed pieces of paper providing contemporaneous description of seller);

- *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992) (ordering new trial for *Brady* violations, where prosecution withheld police report providing description of suspect that did not match defendant's and that "was wholly at odds with the testimony given by [the arresting officer]");

- *People v. Nikollaj*, 155 Misc. 2d 642 (Sup. Ct. Bronx Cty. 1992) (ordering new trial for *Rosario* violations, where police failed to turn over numerous inconsistent statements of complainant officers);

- *People v. Dunn*, 185 A.D.2d 54 (1st Dep't 1993) (reversing conviction in part where, among other things, detective destroyed his investigative notes);

- *People v. White*, 200 A.D.2d 351 (1st Dep't 1994) (reversing conviction where police report containing *Brady* and *Rosario* material was withheld and only discovered through defendant's post-conviction Freedom of Information Law requests to NYPD and BXDA);

- *People v. Morrow*, 204 A.D.2d 356 (2d Dep't 1994) (reversing conviction where significant portion of police report was not disclosed);

- *People v. Brogdon*, 213 A.D.2d 418 (2d Dep't 1995) (reversing conviction where NYPD sergeant destroyed his notes, and where identification by undercover officer "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive");

- *People v. Joseph*, 86 N.Y.2d 565 (1995) (reversing conviction and finding adverse inference instruction to be appropriate where police deliberately destroyed envelopes into which officers had placed cocaine vials seized from defendant);

- *People v. Anderson*, 222 A.D.2d 442 (2d Dep't 1995) (reversing conviction where officer's scratch notes were lost or destroyed due to officer's "lack of due care");

- *People v. White*, 232 A.D.2d 436 (2d Dep't 1996) (reversing conviction where officer lost his memo book through lack of due care);

- *People v. Jackson*, 237 A.D.2d 179 (1st Dep't 1997) (reversing conviction where police withheld Internal Affairs Division reports containing entries "that were significantly at

variance with the prosecution's evidence at trial and were clearly evidence that was favorable to the accused");

- *People v. Gallman*, 240 A.D.2d 512 (2d Dep't 1997) (reversing conviction for failure to disclose notes of police interview with prosecution's key witness);

- *Crespo v. City of New York*, 93-CV-8847 (S.D.N.Y.): Settled in 1996 for $25,000, where plaintiff was arrested without probable cause on weapons possession charges; complaint alleged *Monell* claim based on NYPD's "foster[ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals";

- *Gurley v. City of New York*, 95-CV-2422 (E.D.N.Y.): Settled in 1997 for $1,750,000, where conviction obtained in 1972 was vacated over 20 years later based on prosecutor's withholding of exculpatory evidence, including NYPD ballistics report; complaint alleged that NYPD had longstanding policy of deliberate indifference to constitutional requirements that exculpatory evidence be preserved and disclosed to defendants; and

- *Gordon v. City of New York*, 97-CV-8035 (S.D.N.Y.): Settled in 1998 for $40,000, where plaintiff was arrested without probable cause based on false allegations in felony complaint made by NYPD officers, and charges were dismissed by prosecutor three months after arrest.

212. Indeed, former NYPD Detective Louis Scarcella testified during the CPL Section 440.10 motion hearing of Shabaka Shakur (who succeeded on his claim that the NYPD fabricated his alleged confession) that there was essentially no oversight and supervision of NYPD homicide detectives in the relevant time: they could take cases as they wished and investigate them in whatever manner they desired. Scarcella thus admitted that the NYPD maintained a laissez-faire policy, pattern, practice, and custom when it came to its homicide detectives. Their constitutional violations went unmonitored, unchecked, and undisciplined.

213. In the early 1990s, the New York City Comptroller's Office, under then-Comptroller Elizabeth Holtzman, conducted a study of police misconduct settlements by the City to assess whether credible claims of police misconduct led to disciplinary action by the NYPD. The study confirmed that the NYPD systematically failed to take corrective action in response to credible claims of police misconduct.

214.  During the relevant period, misconduct by the NYPD went hand in hand with misconduct by the BXDA.  From the mid-1970s through 1996, there were at least seventy-two reported cases in which courts found violations of *Brady* violations (eighteen cases), or other violations of the duty not the present false, misleading, or inflammatory evidence or summation argument (fifty-four cases).

215.  Examples of BXDA misconduct from the relevant period include the following cases:

    a.  **Larry Boone and Arthur Cleveland:** In 1973, Larry Boone and Arthur Cleveland were convicted of murdering a man at a nightclub in the Bronx.  The prosecution withheld the testimony of two witnesses who stated that the shooting had actually occurred in an entirely different location.  Both convictions were reversed on appeal in 1975, and both cases were subsequently dismissed.

    b.  **Alberto Ramos:** In 1985, Alberto Ramos, a college student working as a teacher's aide at a day care center in the Bronx, was convicted of sexual abuse of a five-year-old-girl at the center.  On June 1, 1992—less than a decade before Mr. Mallet's wrongful conviction—Bronx State Supreme Court Justice John P. Collins set aside Ramos's conviction because key documents that could have helped Ramos's defense were not turned over to his attorneys by the BXDA, including statements by the victim that Ramos had not done anything. The BXDA dismissed the charges against Ramos in 1994.

    c.  **Adam Pejcinovic and Frank Pejcinovic:** In 1988, Adam and Frank Pejcinovic were convicted of the 1986 assault of two teenagers with baseball bats.  During their trial, the defense learned of a police report implicating another person in the

crime, which had not been provided by the BXDA prior to trial. In June 1991, the Appellate Division of the New York Supreme Court reversed the convictions of Adam and Frank Pejcinovic. The BXDA dismissed the charges against both brothers in 1993.

d. **Jose Morales and Ruben Montalvo:** In 1988, Jose Morales and Ruben Montalvo were convicted of the 1987 murder of Jose Rivera. Both men were convicted solely on the eyewitness testimony of Jennifer Ramirez. After trial, one of the true perpetrators disclosed to several people that he had committed the murder and that Morales and Montalvo were not involved. In 2001, both men were released following the grant of habeas petitions filed in the United States District Court for the Southern District of New York. In his opinion ordering both men unconditionally discharged, then-District Judge Denny Chin criticized the BXDA for withholding evidence that the sole eyewitness, Jennifer Ramirez, had been arrested for a drug offense and had criminal narcotics charges pending against her at the time of trial. *See Morales v. Portuondo*, 165 F. Supp. 601, 612-13 (S.D.N.Y. 2001).

e. **Milton Lantigua:** In 1993, Milton Lantigua was convicted of the 1990 murder of Felix Ayala in the Bronx. The prosecution relied on the eyewitness testimony of Frances Rosario, who identified Mr. Lantigua and testified that she was alone when she witnessed the shooting. The BXDA did not disclose to the defense, however, that Rosario told them she was with a man, "Jo-Jo," at the time of the murder. In 1996—just three years before Mr. Mallet's conviction—the Appellate Division of the New York Supreme Court reversed Mr. Lantigua's conviction due to the

"especially egregious" conduct by prosecutors in failing to disclose the existence of a potential additional witness and in failing to correct Ms. Rosario's false testimony. The appeals court also found that the prosecution had distorted evidence during her summation to the jury, which also warranted reversal. The BXDA subsequently dismissed the case.

f. **Calvin Buari:** In 1995, Calvin Buari was convicted of the 1992 murder of Elijah and Salhaddin Harris. At trial, he was convicted on the basis of testimony from eyewitnesses who later recanted, including one who eventually testified that he falsely identified Buari because prosecutors from the BXDA threatened him with being charged with the murders unless he did so. The prosecution did not disclose this information to the defense. Buari's convictions were vacated in 2017 and the BXDA subsequently dismissed the charges against him.

g. **Larry McKee:** In 1997, Larry McKee was convicted of the 1996 murder of Theodore Vance on a street in the Bronx. Just three weeks before trial, the BXDA revealed for the first time a statement that a witness, Augustus Rivera, gave the night of the shooting. When Mr. McKee's defense attorney interviewed Rivera, he learned that the prosecution had interviewed him two weeks prior and that Rivera had changed his story from the statement he initially provided to the NYPD. The prosecution didn't reveal the name of the detective who took the original statement from Rivera until after McKee's trial was already underway. The trial judge granted a recess for several days, but the detective refused to speak to the defense. After McKee's conviction and prior to sentencing, the trial judge ruled that the prosecution should have disclosed the report of Rivera's statement and the name of

the detective earlier, but that the delay did not cause McKee's trial to be unfair. In 2018, the BXDA Conviction Integrity Unit uncovered that another witness had testified before the grand jury and provided a description of the shooter that did not match Mr. McKee. This witness statement had never been disclosed to the defense.

h. **Charles McKinnon:** In 1998, Charles McKinnon was tried with conspiring with four others to orchestrate the 1995 murder of Denise Raymond in her Bronx apartment. A key witness against McKinnon testified that the day before the murder she rode the elevator with McKinnon and Raymond, who were arguing on the way down the elevator and as they walked out of the building. As McKinnon's trial neared its end, the BXDA disclosed that a security video directly from the building directly contradicted this testimony. The trial judge offered to declare a mistrial, but McKinnon chose to go forward with the trial and was acquitted.

216. As illustrated by these cases and others, the time of Mr. Mallet's prosecution, former DA Johnson, as the manager, chief administrator, and policymaker of the BXDA, a City agency, created and/or maintained policies, customs, and practices of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in the Bronx, including through knowingly and/or recklessly presenting false testimony and arguments at criminal proceedings, suppressing *Brady* information, and covering up these unlawful practices.

217. Former DA Johnson, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the BXDA.

218. Former DA Johnson's policy and practice was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligations to make timely disclosure to the defense of *Brady* information. Former DA Johnson's deliberate indifference to such violations created an atmosphere that caused such violations to continue, including in Mr. Mallet's case.

219. Indeed, civil suits brought by wrongfully convicted individuals have uncovered discovery materials indicating that, at the relevant time, the BXDA had no published code or rules of behavior for prosecutors, no schedule of potential sanctions for misbehavior or objective standards governing when such sanctions would be imposed, no written of formal procedure for investigating or disciplining prosecutors, and no procedure for keeping a record of prosecutors who were cited for or were known to have engaged in improper behavior.

220. Shockingly, for the period from 1975-2011, officials could identify just one prosecutor who has been disciplined in any respect for misbehavior while prosecuting a criminal case.

221. Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), former DA Johnson encouraged such violations by demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements.

222. Despite repeated court decisions finding that prosecutors had wrongfully withheld information, or otherwise had engaged in conduct that misled courts, juries, defendants, and defense attorneys, none of the prosecutors involved was disciplined.

223.     These policies, customs, and practices proximately caused the violations of Mr. Mallet's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

## DAMAGES

224.     This action seeks damages for the period from September 26, 1996 (the date of Mr. Mallet's arrest) through the present.   Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds, and omissions caused Mr. Mallet to be maliciously prosecuted, unfairly tried, wrongfully convicted, and to endure more than 20 years of wrongful imprisonment, including the physical and mental damage arising therefrom.

225.     During his wrongful imprisonment, Mr. Mallet suffered extreme hardships, including, without limitation, physical harm, psychological abuse, extreme degradation, pain and suffering, and the loss of more than 20 years of his life and freedom.

226.     While Mr. Mallet was incarcerated, the State provided abysmal medical care and treatment and caused numerous, major health problems that will plague Mr. Mallet for the rest of his life—including preventable cancer and a debilitating spinal injury.

227.     Mr. Mallet also lost tremendous opportunities.   He lost the most vital years of his life and precious time with his family and friends.

228.     As a direct and proximate result of the acts of Defendants, the injuries and damages sustained by Mr. Mallet, arising from the deprivation of his civil rights, include: violations of his clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional

licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, and egregious injury to reputation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

229. All the alleged acts, misdeeds and omissions committed by Individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of Individual Defendants meets all the standards for imposition of punitive damages.

<b><u>CAUSES OF ACTION</u></b>

<b><u>FIRST CAUSE OF ACTION</u></b>

<b>42 U.S.C. § 1983</b>

<i>Denial of Due Process and Right to a Fair Trial,<br>Fabrication of Evidence, and Suppression of </i>Brady<i> Information<br>(U.S. Constitution Amendments V and XIV)</i>

<b>Against All Individual Defendants</b>

230. Mr. Mallet repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

231. Individual Defendants, acting knowingly, intentionally, deliberately, with malice, and under color of law, deprived Mr. Mallet of his clearly established rights under the Fifth and Fourteenth Amendments to the U.S. Constitution to due process and a fair trial. They did so by: (1) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence and testimony by coercing Mr. Walker into giving a false statement;

and (2) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information.

232. No person of reasonable caution and acting in good faith, having the knowledge and information Individual Defendants had, would have been warranted in concluding that Mr. Mallet was involved in the murder of Mr. Ledeatte, such as to support a probable cause determination. Even setting aside their knowledge that they had manufactured evidence and testimony and suppressed *Brady* information, Individual Defendants knew or, in the absence of deliberate indifference, recklessness, and gross negligence, should have known that there were numerous reasons for skepticism about Mr. Mallet's involvement. In particular, Mr. Mallet was only identified in a coerced statement provided by a single eyewitness who initially did not identify him, who was approximately 150 feet away from the shooting at night, and who testified that the perpetrators were wearing hoodies that at least partially obscured their faces.

233. The presumption of probable cause created by the grand jury indictment is overcome by the fact that Mr. Mallet's indictment was secured based on bad-faith police misconduct. Specifically, the false witness statement extracted by Nieves, Tracy, and/or Gannon was, upon information and belief, the central piece of evidence presented to the grand jury and proximately caused the resulting indictment.

234. Individual Defendants knew, intended, or were deliberately indifferent to the fact that the false and misleading evidence would deprive Mr. Mallet of a fair trial and result in his wrongful conviction and incarceration.

235. Individual Defendants knew, intended, or were deliberately indifferent to the fact that *Brady* information would be concealed from Mr. Mallet and his attorney.

236. Individual Defendants' conduct, committed in concert with one another or others, deprived Mr. Mallet of his rights under the Constitution: (1) not to be prosecuted, convicted, or imprisoned based on false, fabricated, manufactured, or misleading evidence in violation of his rights under the Due Process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution; and (2) to timely disclosure of material evidence favorable to the defense under *Brady* in violation of his rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

237. Individual Defendants' acts and omissions proximately caused the continuation of Mr. Mallet's criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

238. Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Mallet's constitutional rights.

239. Nieves and Tracy's falsification of evidence and arrest of Mr. Mallet without probable cause establishes that they acted with actual malice.

240. Gannon's participation in, knowledge of, and/or indifference to such falsification of evidence, coercion of Mr. Mallet, and arrest of Mr. Mallet without probable cause establishes that he acted with actual malice.

241. Defendants John and Jane Does 3-20 are employees of the NYPD or BXDA who knew of and aided and abetted, and/or failed to intervene to prevent, Nieves, Tracy, and Gannon's falsification of evidence, arrest of Mr. Mallet without probable cause, and denial of Mr. Mallet's right to a fair trial.

242.    The prosecution terminated in Mr. Mallet's favor when his conviction was eventually vacated and the indictment against him dismissed.

243.    Mr. Mallet was, in fact, innocent of the crime for which he was convicted and incarcerated.

244.    Individual Defendants' actions were willful, malicious, oppressive, and reckless, and were of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*Malicious Prosecution and Denial of Fourth Amendment Rights*
*(U.S. Constitution Amendments IV and XIV)*

**Against All Individual Defendants**

245.    Mr. Mallet repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

246.    Individual Defendants, acting individually and in concert, with malice, under color of law, and knowing that probable cause did not exist to arrest Mr. Mallet and prosecute him for the murder of Mr. Ledeatte, caused Mr. Mallet to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Mallet's clearly established right under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures.

247.    Specifically, Individual Defendants, with malice, knew or, in the absence of their deliberate and reckless indifference to the truth, should have known that probable cause did not exist to arrest and prosecute Mr. Mallet, including but not limited to the fact that Mr. Walker's erroneous identification of Mr. Mallet was the product of improper coercion by Tracy and Nieves, and this factor as well as additional material exculpatory and impeachment evidence that

Individual Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Mallet.

248.     In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from the grand jury that vitiated probable cause against Mr. Mallet, including but not limited to their having: (1) manufactured false or misleading evidence and testimony by coercing Mr. Walker into making a false statement; and (2) suppressed *Brady* information, including about Mr. Walker's previous statements, Nieves and Tracy's coercion of Mr. Walker, and Nieves and Tracy's history of similar misconduct.

249.     Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Mallet's constitutional rights.

250.     Individual Defendants initiated and continued the prosecution against Mr. Mallet without probable cause, in violation of Mr. Mallet's clearly established constitutional rights.  No reasonable officer at the time of Mr. Mallet's prosecution or thereafter would have believed this conduct was lawful.

251.     The prosecution terminated in Mr. Mallet's favor when his conviction was eventually vacated and the indictment against him dismissed.

252.     Mr. Mallet was, in fact, innocent of the crime for which he was convicted and incarcerated.

253.     As a direct and proximate result of Individual Defendants' conduct, Mr. Mallet was maliciously prosecuted, wrongly convicted, imprisoned for more than 20 years, and suffered the other grievous damages and injuries set forth above.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

**Against Defendant the City of New York**

254.    Mr. Mallet repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

255.    At the time of Mr. Mallet's arrest and prosecution, the NYPD, an agency of Defendant the City of New York, created and maintained policies, customs, and practices of deliberate indifference to violations by its employees of the constitutional rights of individuals who were investigated and criminally prosecuted, including through: (1) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence and testimony; (2) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information; and (3) covering up these unlawful practices.

256.    Just a few years before Mr. Mallet's trial, the Mollen Commission investigated corruption in the NYPD and exposed the NYPD's practice of failing to properly train, supervise, and discipline officers for fabricating evidence, engaging in improper police investigations, and failing to turn over *Brady* material.

257.    As the Mollen Report found, Nieves, Tracy, and/or Gannon's misconduct could not have been isolated or unknown within the NYPD.  Rather, a laissez-faire NYPD culture allowed detectives to continuously violate the constitutional rights of the citizens of New York City, including Mr. Mallet.

258.    The repeated nature of Nieves and Tracy's misconduct could not have gone unnoticed.  Yet NYPD failed to take action via training, supervision, and/or discipline to ensure

that either detective's misconduct did not continue and result in constitutional violations like those suffered by Mr. Mallet.

259.    The violations of Mr. Mallet's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to the NYPD and, by extension, the City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Mallet, subject to arrest and investigation, including:

    a.    the institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

        i.    the duty not to create or use false or misleading evidence, testimony, and arguments during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

        ii.    the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, statements, and arguments, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

        iii.    the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

    b.    the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

260.    The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City, who knew that such policies, procedures, regulations, practices, and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases.

261.    The City knew of the unconstitutional conduct occurring among its employees in light of the numerous credible allegations, many substantiated by judicial decisions, that its employees: (1) wrongfully withheld, lost, or destroyed evidence favorable to the defense that was required to be timely disclosed to the defense under *Brady*; (2) had presented or failed to correct false or misleading testimony and argument; and (3) had abused judicial process to coerce false or inherently unreliable testimonies and statements.

262.    Despite this knowledge, the supervisory and policymaking officers and officials of the City perpetuated or failed to take preventative or remedial measures to terminate said policies, procedures, practices, and customs; did not effectively instruct, train, or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies, or procedures for investigating and disciplining employees who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practices, and customs, described above, with deliberate indifference to the effect their actions would have upon the constitutional rights of individuals and citizens of the City and State of New York.

263. The aforesaid policies, practices, and customs of the City were substantial, contributing factors in bringing about the aforesaid violations of Mr. Mallet's rights under the Constitution and laws of the United States and in causing his wrongful conviction and resulting damages.

264. The supervisory and policymaking officers and officials of the City were deliberately indifferent to the manner in which convictions were secured without regard to defendants' constitutional rights or guilt. The violations of defendants' rights were endemic, and the City was aware of these practices but did not take corrective or preventative action to correct them.

## FOURTH CAUSE OF ACTION

### Malicious Prosecution

*New York State Law*

### Against All Defendants

265. Mr. Mallet repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

266. Individual Defendants, acting individually and in concert, with malice, and knowing that probable cause did not exist to arrest Mr. Mallet and prosecute him for the murder of Mr. Ledeatte, caused Mr. Mallet to be arrested, charged, and prosecuted for that crime.

267. Specifically, Individual Defendants, with malice, knew, or in the absence of their deliberate and reckless indifference to the truth, should have known that probable cause did not exist to arrest and prosecute Mr. Mallet, including but not limited to the fact that Mr. Walker's false identification of Mr. Mallet was coerced by Nieves and Tracy, and this factor as well as additional material exculpatory and impeachment evidence that Individual Defendants did not

disclose undermined the evidence presented in support of a probable cause finding against Mr. Mallet.

268. In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from the grand jury that vitiated probable cause against Mr. Mallet, including but not limited to their having: (1) manufactured false or misleading evidence and testimony by coercing Mr. Walker into giving a false statement identifying Mr. Mallet; and (2) suppressed *Brady* information, including Mr. Walker's previous statements, the police misconduct that led to Mr. Walker's false statement, and Nieves and Tracy's histories of misconduct.

269. Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Mallet's constitutional rights.

270. Individual Defendants initiated and continued the prosecution against Mr. Mallet without probable cause.

271. The prosecution terminated in Mr. Mallet's favor when his conviction was eventually vacated and the indictment against him dismissed.

272. Mr. Mallet was, in fact, innocent of the crime for which he was convicted and incarcerated.

273. Defendant the City of New York is liable under the doctrine of *respondeat superior* for the malicious prosecution of Mr. Mallet by Individual Defendants, all of whom were acting as agents of the City of New York and within the scope of their employment.

274.    As a direct and proximate result of Defendants' conduct, Mr. Mallet was maliciously prosecuted, wrongly convicted, imprisoned for more than 20 years, and suffered the other grievous damages and injuries set forth above.

## FIFTH CAUSE OF ACTION

### New York State Constitution

*Denial of Due Process and Right to a Fair Trial, Fabrication of Evidence,*
*Suppression of Exculpatory Information, and Malicious Prosecution*
*(New York State Constitution, Article I, §§ 5, 6, and 12)*

### Against All Defendants

275.    Mr. Mallet repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

276.    The acts and omissions described above caused violations of Mr. Mallet's rights under the New York State Constitution, including the rights to due process and to be free from unreasonable searches and seizures, and Mr. Mallet's resulting damages.

277.    To the extent that any of Mr. Mallet's claims against one or more Defendants is unavailable under 42 U.S.C. § 1983—including, but not limited to, 42 U.S.C. § 1983's lack of *respondeat superior* liability—Mr. Mallet retains a legal remedy for such claims under the New York State Constitution.

## SIXTH CAUSE OF ACTION

### Negligence

*New York State Law*

### Against Defendant the City of New York

278.    Mr. Mallet repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

279. Defendant the City of New York is liable for negligence, having breached its duty of reasonable care to Mr. Mallet.

280. Specifically, and by way of example, the City intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline its agents and employees with regard to the matters described above. The City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Mr. Mallet's wrongful conviction and resulting damages.

281. The City's negligence and gross negligence directly and proximately caused Mr. Mallet to be wrongly prosecuted and imprisoned for more than 20 years.

282. Mr. Mallet was, in fact, innocent of the crime for which he was convicted and incarcerated. Mr. Mallet's cause of action for negligence was unavailable to him until his prosecution finally terminated in his favor, when his conviction was eventually vacated and the indictment against him dismissed. As a direct and proximate result of Defendants' conduct, Mr. Mallet was maliciously prosecuted, wrongly convicted, imprisoned for more than 20 years, and suffered the other grievous damages and injuries set forth above.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Antonio Mallet demands judgment against the above-captioned Defendants as follows:

a. for compensatory damages to be determined at trial, but in all events no less than $50 million;

b. for punitive damages against each Individual Defendant in an amount to be determined at trial;

c. for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.   for pre- and post-judgment interest as allowed by law; and

e.   for such other relief as this Court deems just and proper.

Dated:  September 16, 2025
        New York, New York

SHANIES LAW OFFICE


By:   _David W Shanies_____

David B. Shanies
Deborah I. Francois
Eleanor C. Davis
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
eleanor@shanieslaw.com


LAW OFFICE OF RONALD KUBY


By:   _____

Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, New York 10011
(212) 529-0223 (Tel)
ronaldkuby@gmail.com


*Attorneys for Plaintiff Antonio Mallet*